UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | |
|---|---|
| *In re Lumexa Imaging Data Breach Litigation* | **Lead Case No.: 5:26-cv-00339-BO**<br><br>**JURY TRIAL DEMANDED** |

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Brandon James, Rebecca Ortega, Jayson Moreno, Aaron Ault, Richard Freiberg, and Rosemary Jones ("Plaintiffs"), on behalf of all others similarly situated, by and through their undersigned counsel, brings this Consolidated Class Action Complaint against Defendant Lumexa Imaging, Inc. ("Defendant"). Plaintiffs allege the following upon information and belief based on and the investigation of counsel, except as to those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

## INTRODUCTION

1. Plaintiffs and the proposed Class Members bring this class action lawsuit on behalf of all persons who entrusted Defendant with sensitive Personally Identifiable Information ("PII")[1] and Protected Health Information ("PHI") (collectively "Private Information") that was impacted in a data breach (the "Data Breach" or the "Breach").

2. Plaintiffs' claims arise from Defendant's failure to properly secure and safeguard Private Information that was entrusted to it, and its accompanying responsibility to store and transfer that information.

---

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual.

3. Defendant is one of the nation's largest providers of outpatient diagnostic imaging services and a HIPPA-covered entity and/or business associate. It provides administrative services to affiliated radiology practices and imaging centers, including American Health Imaging, Inc., Charlotte Radiology, P.A., Gateway Diagnostic Imaging, Radiology Ltd. Associates, LLC, South Jersey Radiology Associates, Touchstone Medical Imaging, LLC, and Windsong Radiology Group.

4. Because Defendant required Plaintiffs' and Class Members' Private Information in exchange for diagnostic imaging services provided by Defendant's affiliated radiology practices and imaging centers, by accepting their Private Information, Defendant owed and otherwise assumed statutory, regulatory, contractual, and common law duties and obligations, and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' Private Information and keeping it confidential, safe, and secure from the type of unauthorized access, disclosure, and theft that occurred in the Data Breach, including by ensuring that their vendors implemented adequate, secure, and compliant safeguards to protect their own computer systems and networks.

5. Beginning on June 12, 2026, Defendant began sending "Notice "Letters" to the impacted Plaintiffs and Class Members. Defendant's affiliated radiology practices and imaging centers also posted a notice to patients on their respective websites about the Data Breach.

6. The Notice Letters state that, on April 9, 2026, Defendant was notified by one of its vendors, which Defendant has yet to publicly identify, about suspicious activity within a portion of the vendor's network dedicated to Defendant's affiliated radiology practices and

imaging centers.[2] It contracted with that vendor to have the vendor provide non-clinical operational support.[3] On April 15, 2026, Defendant learned that an unauthorized person may have viewed or obtained copies of documents containing its affiliated radiology practices and imaging centers' patient information from the vendor's system.[4] Notably, Defendant confirmed that "Documents were taken between March 31, 2026 and April 9, 2026."[5]

7. At least the following types of Private Information were compromised as a result of the Data Breach: names, dates of birth, addresses, phone numbers, Social Security numbers, patient account numbers, insurance information, and clinical information including at least visit dates, diagnoses, and other health information related to radiological services.[6]

8. Notably, Plaintiffs Rebecca Ortega, Aaron Ault, Richard Freibergall received personalized Data Breach notices from Defendant confirming that their "financial account number[s]" were exposed during the Data Breach. Thus, the types of Private Information compromised during the Data Breach also included financial account information.

9. Defendant provided this vendor with Plaintiffs' and Class Members' Private Information, which Defendant had obtained, collected, used, and derived a benefit from, thereby assuming legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion and to promptly notify customers if a breach occurs.

10. Defendant failed to take precautions designed to keep individuals' Private Information secure.

---

[2] *Breach Notification*, CAL. ATTY GEN (May 15, 2026) https://oag.ca.gov/system/files/Lumexa%20-%20California%20Notification.pdf.
[3] *Id.*
[4] *Id.*
[5] *Id.*
[6] *Id.*

11. Defendant owed Plaintiffs and Class Members a duty to take all reasonable and necessary measures to keep the Private Information collected safe and secure from unauthorized access. Yet Defendant breached its duty by failing to implement or maintain adequate security practices governing its vendor's receipt and possession of the Private Information.

12. Defendant admits that information in its vendor's system was accessed by unauthorized individuals, though it provided little information regarding how the Data Breach occurred.

13. The sensitive nature of the data exposed through the Data Breach signifies that Plaintiffs and Class Members have suffered irreparable harm. Plaintiffs and Class Members have lost the ability to control their private information and are subject to an increased risk of identity theft.

14. Defendant, despite having the financial wherewithal and personnel necessary to ensure that vendors to which Private Information was entrusted would not be subject to a Data Breach, Defendant nevertheless failed to use reasonable security procedures and practice appropriate, causing the exposure of Plaintiffs' and Class Members' Private Information.

15. Plaintiffs' and Class Members' Private Information was exposed to criminals. Plaintiffs and the Class Members have suffered and will continue to suffer injuries including: financial losses caused by misuse of their Private Information; the loss or diminished value of their Private Information as a result of the Data Breach; lost time associated with detecting and preventing identity theft; and theft of personal and financial information.

16. Plaintiffs bring this action on behalf of all persons whose Private Information was compromised as a result of Defendant's failure to: (i) adequately protect the Private Information of Plaintiffs and Class Members; (ii) warn Plaintiffs and Class Members of Defendant's

inadequate information security practices, including those of its vendor; and (iii) timely notify Plaintiffs and Class Members of the Data Breach.

17. Plaintiffs bring this action individually and on behalf of a Nationwide Class of similarly situated individuals against Defendant for: negligence; negligence *per se*; unjust enrichment, breach of third party beneficiary contract, unjust enrichment, and declaratory and injunctive relief.

18. Plaintiffs seek to remedy these harms and prevent any future data compromise on behalf of themselves and all similarly situated persons whose personal data was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendant's inadequate data security practices.

## PARTIES

***Plaintiffs***

19. Plaintiff Brandon James is a natural person and resident of Charlotte, North Carolina where he intends to remain. Thus, Plaintiff Brandon James is a citizen of North Carolina.

20. Plaintiff Rebecca Mungia Ortega is a natural person and resident of Nogales, Arizona where she intends to remain. Thus, Plaintiff Ortega is a citizen of Arizona.

21. Plaintiff Jayson Moreno is a natural person and resident of Lake Worth, Texas where he intends to remain. Thus, Plaintiff Moreno is a citizen of Texas.

22. Plaintiff Aaron Ault is a natural person and resident of Flagstaff, Arizona where he intends to remain. Thus, Plaintiff Ault is a citizen of Arizona.

23. Plaintiff Richard Freiberg is a natural person and resident of Charlotte, North Carolina where he intends to remain. Thus, Plaintiff Freiberg is a citizen of North Carolina.

24. Plaintiff Rosemary Jones is a natural person and resident of Huntersville, North

Carolina where she intends to remain. Thus, Plaintiff Jones is a citizen of North Carolina.

***Defendant Lumexa Imaging, Inc.***

25. Defendant Lumexa Imaging, Inc. is a corporation organized under the laws of the State of Delaware, having its principal place of business located at 4200 Six Forks Road, Ste. 1000 Raleigh, North Carolina, 27609.

## JURISDICTION AND VENUE

26. This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than 100 and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendant's citizenship, including Plaintiffs Ortega, Moreno, and Ault. Thus, minimal diversity exists under 28 U.S.C. § 1332 (d) (2) (A). Defendant has its principal place of business located in this District.

27. This Court has personal jurisdiction over Defendant because Defendant is registered to do business and maintains its principal place of business in this District.

28. Venue is proper in this Court because Defendant's principal place of business is located in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' and Class Members' claims occurred in this District.

## FACTUAL ALLEGATIONS

### A. Background on Defendant

29. Defendant is one of the largest outpatient medical imaging providers in the United States through its affiliated radiology practices and imaging centers.

30. Promises and representations were made by or on behalf of Defendant to individuals, including Plaintiffs and Class Members, that the Private Information collected from

them would be kept safe and confidential by Defendant, and that the privacy of that information would be maintained by Defendant.

31. Plaintiffs and Class Members provided their Private Information to Defendant and/or one of Defendant's affiliated radiology practices and imaging centers, with the reasonable expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

32. As a result of collecting and storing the Private Information of Plaintiffs and Class Members for its own financial benefit, Defendant had a continuous duty to adopt and employ reasonable measures to protect Plaintiffs' and the Class Members' Private Information from disclosure to third parties, including when Defendant contracted with a vendor to provide non-clinical operational support to Defendant that involved the Private Information.

33. Because of the highly sensitive and personal nature of the information that Defendant acquires, it has a nondelegable duty to Plaintiffs and Class Members to implement reasonable and adequate security measures to protect their Private Information. Defendant promises, among other things, to keep customers' files private; comply with regulation and industry standards, including HIPAA and Federal Trade Commission ("FTC") guidelines, related to data security and maintenance of patient files and the Private Information contained therein; inform consumers of their legal duties and comply with all federal and state laws protecting consumer Private Information; only use and release Private Information for reasons that relate to the services Plaintiffs and Class Members obtained; and provide adequate notice to individuals if their Private Information is disclosed without authorization.

34. As evidenced by Defendant's Privacy Policy, available on its website, Defendant understood its obligation to safeguard Plaintiffs' and Class Members' Private Information. That

Privacy Policy includes the following material representations and promises:

> Lumexa Imaging, Inc. and its affiliated practices and business units (collectively "we" or "our") respect your privacy and are committed to protecting it through our compliance with this Privacy Policy ("Policy"). This Policy describes the types of personal information we may collect from you or that you may provide when you visit www.lumexaimaging.com and any of our other related webpages and websites (collectively, our "Websites") or when you use our mobile applications (our "Applications"), and our practices for collecting, using, maintaining, protecting and disclosing that information. We refer to our Websites and Applications cumulatively as our "Platforms".
>
> This Policy applies to any information that we collect on our Platforms, including any information in any emails, posts, texts and other electronic messages between you and the Platforms and any information about you transferred to the Platforms from other websites. This Policy also applies to any related information that we collect about you offline but that will be processed by automated means using the Platforms.
>
> . . . .
>
> We may collect several types of personal information from and about users of our Platforms, including information by which you may be personally identified, such as your name, postal address, email address, and telephone number ("Personal Information"). In addition, if we sell any products or services on our Platforms, we may collect information required for the payment for products or services, including credit card numbers, security codes and other financial information.
>
> The information we collect on or through our Platforms may include information that you provide by registering to use our Platforms, filing in and submitting web forms, using our services, posting material, requesting further services or reporting a problem with our Platforms. We will also retain records and copies of your correspondence (including email addresses), if you contact us.
>
> We use information that we collect about you or that you provide to us, including any Personal Information, to:
>
> - Present our Platforms and its contents to you,
> - Provide you with information, products or services that you request from us,
> - Thank you for contacting our Platforms;
> - Explain new product offerings and features of our services;
> - Provide you with special promotional offers and information about our products, services and billing;
> - Contact you regarding customer service related issues;
> - Ask for your feedback on our current and potential services, products and marketing efforts in the form of a survey, and

- Fulfill any other purpose for which you provide the information.

> . . . .
>
> We may disclose Personal Information to our affiliated practices and business units, to third party payment processors that we use to process transactions securely, and to any other contractors, service providers and other third parties who need to know such information to provide services that we request to support our permitted uses of Personal Information.
>
> . . . .
>
> We have implemented measures designed to secure your Personal Information from accidental loss and from unauthorized access, use, alteration and disclosure. All information that you provide to us is stored on our servers behind firewalls, and certain Personal Information will be encrypted using secure socket layer (SSL) technology.[7]

**B. The Data Breach**

35. On April 9, 2026, Defendant was notified by one of its vendors, which Defendant has yet to publicly identify, about suspicious activity within a portion of the vendor's network dedicated to Defendant's affiliated radiology practices and imaging centers.[8] It has contracted with that vendor to have the vendor provide non-clinical operational support.[9] On April 15, 2026, Defendant learned that an unauthorized person may have viewed or obtained copies of documents containing its affiliated radiology practices and imaging centers' patient information from the vendor's system.[10] Notably, Defendant confirmed that "Documents were taken between March 31, 2026 and April 9, 2026."[11]

36. At least the following types of Private Information were compromised as a result

---

[7] *Privacy Policy*, LUMEXA IMAGING (Dec. 6, 2019) https://www.lumexaimaging.com/privacy-policy/.
[8] *Breach Notification*, CAL. ATTY GEN (May 15, 2026) https://oag.ca.gov/system/files/Lumexa%20-%20California%20Notification.pdf.
[9] *Id.*
[10] *Id.*
[11] *Id.*

of the Data Breach: names, dates of birth, addresses, phone numbers, Social Security numbers, patient account numbers, insurance information, and clinical information including at least visit dates, diagnoses, and other health information related to radiological services.[12]

37. Notably, Plaintiffs Rebecca Ortega, Aaron Ault, Richard Freibergall received personalized Data Breach notices from Defendant confirming that their "financial account number[s]" were exposed during the Data Breach. Thus, the types of Private Information compromised during the Data Breach also included financial account information.

38. Furthermore, in its Data Breach Notice, Defendant used the obfuscating language "identifiers such as" when describing the types of Private Information exposed during the Data Breach.[13] Thus, on information and belief, the Data Breach exposed a wider range of data than Defendant has acknowledged so far

39. Currently, the precise number of Class Members is unclear. But upon information and belief, the size of the putative class can be ascertained from information in Defendant's custody and control. However, Defendant has confirmed that there are 3,632 Class Members in Washington alone.[14]

40. Defendant failed to take precautions designed to keep individuals' Private Information secure.

41. While Defendant sought to minimize the damage caused by the Data Breach, it cannot and has not denied that there was unauthorized access to the sensitive Private Information of Plaintiffs and Class Members.

42. Individuals affected by the Data Breach are, and remain, at risk that their data will

---

[12] *Id.*
[13] *Id.*
[14] *Lumexa Imaging*, WASH. ATTY GEN (June 12, 2026) https://www.atg.wa.gov/lumexa-imaging.

be sold or listed on the dark web and, ultimately, illegally used in the future.

43. In an official filing with the Securities and Exchange Commission, Defendant's parent company advertised that:

a. "We maintain information security policies and procedures designed to assess cybersecurity risks associated with third-party vendors that handle or have access to our information or systems."[15]

b. "Vendors are classified by risk level and may be subject to security assessments, which may include questionnaires and reviews of vendor security protocols."[16]

c. "Vendor security assessments are periodically reassessed based on the vendor's risk profile and the sensitivity of the data or systems to which the vendor has access."[17]

d. "Identified risks may be addressed as needed through remediation plans or contractual safeguards."[18]

e. "Vendor agreements generally include provisions addressing cybersecurity safeguards and notification obligations in case of a breach."[19]

44. In an official filing with the Securities and Exchange Commission, Defendant's parent confirmed that:

a. "On April 15, 2026, we became aware that certain electronic patient data, including protected health information, was extracted from the information technology systems of a vendor contracted by us to provide non-clinical, administrative services to us and

---

[15] *Form 10-K*, SEC (March 30, 2026) https://www.sec.gov/Archives/edgar/data/2071288/000119312526131907/lmri_10k_2025.htm.
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*

our affiliated entities."[20]

45. In a statement to news media, a "Lumexa representative" revealed that:

a. "All of your information was viewed, so I totally agree with that. It was a HIPAA violation[.]"[21]

b. "We have removed unauthorized software, and we have also reset all of the passwords[.]"[22]

46. The Lumexa representative also told the journalist—who herself had received a Data Breach notice from Defendant—that she should "monitor her bank account[.]"[23]

47. As explained by the global cybersecurity firm BlackFog, the *modus operandi* of cybercriminals is to exfiltrate private information through a data breach and then "post it on forums on the Dark Web where it will be sold for profit."[24]

48. Indeed, the Federal Trade Commission has explained that "data stolen from businesses ends up on the dark web where criminals buy and sell it to commit fraud, get fake identity documents, or fund their criminal organizations."[25]

49. Thus, on information and belief, the Private Information of Plaintiffs and the Class has already been leaked or sold by cybercriminals on the Dark Web or will be leaked or sold

---

[20] *Form 10-Q* LUMEXA (May 12, 2026) https://ir.lumexaimaging.com/static-files/00b77605-e153-4db4-ac69-6385674404e1.

[21] Meagan Thompson, *Lumexa data breach exposes medical records of Butte residents*, KBZK BOZEMAN (July 7, 2026, 6:44 PM) https://www.kbzk.com/news/lumexa-data-breach-exposes-medical-records-of-butte-residents.

[22] *Id.*

[23] KBZK Bozeman MT News, *Lumexa data breach exposes medical records of Butte residents*, YOUTUBE (July 7, 2026) https://www.youtube.com/watch?v=gDeIpPCC5lk (discussing at 2:02).

[24] Brenda Robb, *After the Data Breach – What Happens to Your Data*, BLACKFOG (July 27, 2025) https://www.blackfog.com/after-the-data-breach-what-happens-to-your-data/.

[25] John Krebs, *The dark web: What your business needs to know*, FED. TRADE COMM. (Oct. 17, 2017) https://www.ftc.gov/business-guidance/blog/2017/10/dark-web-what-your-business-needs-know.

imminently by cybercriminals on the Dark Web.

### C. Defendant's Failure to Prevent the Data Breach

50. As alleged in more detail below, Defendant failed to take adequate measures to adequately vet or oversee its vendor's data security practices to protect and safeguard Private Information on the vendor's computer network against unauthorized access.

51. The Private Information that Defendant allowed to be exposed in the Data Breach is the type of private information that Defendant knew or should have known would be the target of cyberattacks.

52. Despite its own knowledge of the inherent risks of cyberattacks, and notwithstanding the FTC's data security principles and practices,[26] Defendant failed to disclose that its systems and security practices, and those belonging to its third-party vendors, were inadequate to reasonably safeguard its past and present patients Private Information.

### D. Defendant Owed Plaintiffs and Class Members a Duty to Safeguard their Private Information

53. Defendant had a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendant owed a duty to Plaintiffs and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Class Members.

---

[26] *Protecting Personal Information: A Guide for Business,* FED. TRADE COMM'N (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

54. Defendant owed a duty to Plaintiffs and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in its possession or in vendor's possession, including adequately training its employees and others who work with and supervise vendors on how to adequately protect Private Information.

55. Indeed, Defendant's entire business depends on patients entrusting it with their Private Information. Without their Private Information, Defendant and its affiliated radiology practices and imaging centers would not be able to provide diagnostic services and would not be able to bill for services rendered. More specifically, to provide the services, Defendant knows that patients must trust that Defendant keeping their Private Information private and secure. If the patients lack trust in Defendant or knew Defendant would insecurely store, safeguard, or transmit their Private Information, then they will not disclose that information to it and would choose a competitor.

56. Despite its obligations to safeguard Plaintiffs' and Class Members' Private Information, Defendant failed to adequately vet or oversee its vendor's data security practices, in violation of its own policies requiring vendors to maintain robust privacy protections. Defendant also failed to verify whether the vendor had implemented the required privacy training, risk management systems, and contractual safeguards.

57. Defendant's failure to ensure that its vendor adhered to basic privacy and security practices—despite its public commitments and legal obligations—constitutes a breach of its own policies and directly contributed to the exposure of Plaintiffs' and Class Members' sensitive Private Information.

58. Defendant owed a duty to Plaintiffs and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

59. Defendant owed a duty of care to Plaintiffs and Class Members because they were foreseeable and probable victims of any inadequate data security practices, including those of every vendor with which Defendant contracted for Defendant to perform its services.

**E. Defendant Was on Notice of Cyberattack Threats and of the Inadequacy of Its Vendor Data Security.**

60. Defendant's negligence in failing to safeguard Plaintiffs' and Class Members' Private Information is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data, particularly financial data.

61. Private Information of the kind accessed in the Data Breach is of great value to cybercriminals as it can be used for a variety of unlawful and nefarious purposes, including ransomware, fraudulent misuse, and sale on the Internet black market known as the dark web.

62. Private Information can also be used to distinguish, identify, or trace an individual's identity, such as his or her name, Social Security number, and financial records. This may be accomplished alone, or in combination with other personal or identifying information connected or linked to an individual such as his or her birthdate, birthplace, and mother's maiden name.

63. Data thieves regularly target entities that store Private Information like Defendant due to the highly Private Information it maintains. Defendant knew and understood that Plaintiffs' and Class Members' Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize it through unauthorized access.

64. Data breaches are on the rise. The increase in data breach attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant itself. According to IBM's 2022 report, "[f]or 83% of companies, it's not if

a data breach will happen, but when."[27]

65. In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[28]

66. In 2022, the Identity Theft Resource Center's Annual End-of-Year Data Breach Report listed 1,802 total compromises involving 422,143,312 victims for 2022, which was just 50 compromises short of the record set in 2021.[29]

67. The number of data breach victims surpassed 1 billion for the first half of 2024, according to the Identity Theft Resource Center.[30]

68. This trend has not slowed. The United States saw a new record of 3,322 data compromises in 2025, a massive 79 percent (79%) jump over five years.[31]

69. This readily available and accessible information confirms that, prior to the Data Breach, Defendant knew or should have known that: (i) cybercriminals were targeting entities such as Defendant that stored large volumes of PII, (ii) cybercriminals were ferociously aggressive in their pursuit of companies in possession of significant Private Information such as Defendant, (iii) cybercriminals were leaking corporate information on dark web portals, and (iv) cybercriminals' tactics included threatening to release stolen data.

---

[27] IBM, *Cost of a data breach 2022: A million-dollar race to detect and respond*, https://www.ibm.com/reports/data-breach
[28] *See* 2021 Data Breach Annual Report, ITRC 6 (Jan. 2022), available at https://www.idtheftcenter.org/notified.
[29] *2022 End of Year Data Breach Report*, Identity Theft Resource Center (Jan. 25, 2023), available at: https://www.idtheftcenter.org/publication/2022-data-breach-report/?utm_source=press+release&utm_medium=web&utm_campaign=2022+Data+Breach+Report.
[30] https://www.usatoday.com/story/money/2024/07/18/data-breach-what-to-do/74441060007/.
[31] *2025 End of Year Data Breach Report*, Identity Theft Resource Center (Jan. 2026), available at: https://www.idtheftcenter.org/wp-content/uploads/2026/01/2025-ITRC-Annual-Data-Breach-Report.pdf.

70. Also, in light of recent high profile data breaches at other industry leading companies, including T-Mobile, USA (37 million records, February-March 2023), 23andMe, Inc. (20 million records, October 2023), Wilton Reassurance Company (1.4 million records, June 2023), NCB Management Services, Inc. (1 million records, February 2023), Defendant knew or should have known that the Private Information that they collected and maintained would be targeted by cybercriminals.

71. Despite the prevalence of public announcements of data breaches and data security compromises, Defendant failed to take appropriate steps to protect the Private Information of Plaintiffs and Class Members from being compromised.

72. As a company in the healthcare sector in possession of patient Private Information, Defendant knew or should have known the importance of safeguarding the Private Information entrusted to them by Plaintiffs and Class Members.

73. Data breaches concerning medical records and/or healthcare have been on a steady upward trend for over a decade. According to the *HIPAA Journal*, these incidents have increasingly involved millions of affected patients. High-profile breaches at healthcare providers and related service companies in recent years include Change Healthcare, Inc. (affecting 190 million individuals in 2024); Anthem, Inc. (affecting 78.8 million individuals in 2015); American Medical Collection Agency (affecting more than twenty-six million individuals in 2019); Welltok, Inc. (affecting 14.7 million individuals in 2023); Premera Blue Cross (affecting eleven million individuals in 2015); CareSource (affecting more than three million individuals in 2023); Perry Johnson & Associates, Inc. (affecting 9.3 million people in 2023); Excellus Health Plan, Inc. (affecting ten million individuals in 2015); and many more.

74. Data breaches in the healthcare sector outnumber those in other sectors by a wide

margin. An analysis of data breaches recorded on the Privacy Rights database between 2015 and 2022 showed that 32% of all recorded data breaches were in the healthcare sector—almost double the number recorded in the financial and manufacturing sectors.

75. In 2018, the healthcare sector reported the second largest number of data breaches among all measured sectors, with the highest rate of exposure per breach.

76. In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 victims' sensitive records being exposed, a 68% increase from 2020. Of the 1,862 recorded data breaches, 330 of them, or 17.7% were in the healthcare industry. The 330 reported breaches in 2021 exposed nearly 30 million sensitive records (28,045,658), an increase from the 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.

77. In 2022, entities in custody of PHI and/or medical information reported the largest number of data breaches among all measured sectors, with the highest rate of exposure per breach.

78. In 2023, 725 data breaches were reported to the HHS Office for Civil Rights ("OCR"), exposing over 133 million records.

79. According to the HIPAA Journal, "[t]here are so many more data breaches in the healthcare sector than in other sectors because healthcare data is more valuable on the black market than any other type of data."[32] "This is because it takes longer for healthcare fraud to be discovered and stolen data can be used for longer compared to (for example) a stolen credit card."[33]

80. Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that victims were often

---

[32] Steve Alder, *Healthcare Data Breach Statistics*, THE HIPAA JOURNAL (Jan. 4, 2026), at https://www.hipaajournal.com/healthcare-data-breach-statistics/.
[33] *Id.*

forced to pay out of pocket costs for healthcare they did not receive in order to restore coverage.[34] Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the patients were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals, and detrimentally impact the economy as a whole.

81. Put differently, companies in the healthcare sector "sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From Social Security numbers and insurance policies, to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[35]

82. Cyberattacks on medical systems and healthcare and healthcare adjacent companies like Defendant have become so notorious that the FBI and U.S. Secret Service have issued warnings to potential targets so they are aware of, and prepared for, a potential attack.

83. For example, in August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated, "The FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[36]

84. Further, in October 2020, in response to growing cybersecurity threats, the Federal

---

[34] *See* Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), at https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/.

[35] Eyal Benishti, *How to Safeguard Hospital Data from Email Spoofing Attacks*, CHIEF HEALTHCARE EXECUTIVE (Apr. 4, 2019), at https://www.chiefhealthcareexecutive.com/view/how-to-safeguard-hospital-data-from-email-spoofing-attacks.

[36] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, REUTERS (Aug. 20, 2014), at https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcarefirms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820.

Bureau of Investigation ("FBI"), CISA, and HHS issued a Joint Cybersecurity Advisory warning U.S. healthcare entities of a "credible and imminent cybercrime threat" and urging immediate implementation of robust, layered security defenses.[37]

85. The American Medical Association has also warned healthcare companies about the importance of protecting their patients' confidential information, explaining,

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that ***cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care***.[38]

86. Health-related breaches carry outsized risk. The Department of Health and Human Services' Office for Civil Rights has repeatedly flagged the downstream harm and regulatory exposure when business associates—contractors that handle protected health information—are compromised. Unlike payment card numbers, which can be reissued, health and identity data have a long shelf life on criminal markets.

87. Business associates of healthcare organizations, like Defendant and Defendant's vendor, "represent a particularly concerning risk."[39] Two-thirds of the largest healthcare data breaches in U.S. history originated from third-party vendors such as business associates, according to federal records and independent breach analyses.

---

[37] *Ransomware Activity Targeting the Healthcare and Public Health Sector*, JOINT CYBERSECURITY ADVISORY (October 28, 2020), at https://www.cisa.gov/sites/default/files/publications/AA20-302A_Ransomware%20_Activity_Targeting_the_Healthcare_and_Public_Health_Sector.pdf.

[38] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, AM. MED.ASS'N (Oct. 4, 2019), at https://www.ama-assn.org/practicemanagement/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals (emphasis added).

[39] *Study: Impact of Cloud Vendor Breaches on Healthcare*, CENSINET, at https://www.censinet.com/perspectives/impact-cloud-vendor-breaches-healthcare.

88. During the third quarter of 2025 alone, business associates were linked to 30 breaches (21.58% of incidents), affecting 796,552 patients. These numbers highlight the critical vulnerabilities posed by third-party vendors in healthcare cybersecurity, showing both the frequency and the far-reaching consequences of such breaches.

89. Consequently, Defendant knew or should have known of the importance of safeguarding Plaintiffs' and Class Members' Private Information and of the foreseeable consequences that would occur if Defendant's or its vendors' data security systems were breached, including the significant costs that would be imposed on victims as a result of a breach.

90. Given the nature of the Data Breach, it was foreseeable that Plaintiffs' and Class Members' Private Information in Defendant's custody and care would be targeted by hackers and cybercriminals for use in a variety of different injurious ways. Indeed, the cybercriminals who possess Plaintiffs' and Class Members' Private Information can easily obtain their tax returns or open fraudulent credit card accounts in Plaintiffs' and Class Members' names.

91. Defendant likewise knew or should have known of the foreseeable consequences if their network systems were breached. Such consequences include the significant costs imposed on Plaintiffs and Class Members due to a breach. Nevertheless, Defendant failed to implement or follow reasonable cybersecurity measures to protect against the Data Breach.

**F. Defendant Was Required, But Failed, to Comply with FTC Rules and Guidance.**

92. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making.

93. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which establishes cyber-security guidelines for businesses like Defendant.

These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

94. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

95. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect third parties' confidential data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures business like Defendant must undertake to meet its data security obligations.

96. Such FTC enforcement actions include actions that fail to employ adequate data security practices like Defendant. See, e.g., *In the Matter of LabMD, Inc.*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

97. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private

Information. The FTC publications and orders described above also form part of the basis of Defendant's duties in this regard.

98. The FTC has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "[m]ost consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."40

99. Defendant failed to properly implement basic data security practices, in violation of its duties under the FTC Act.

100. Defendant's failures to employ reasonable and appropriate means to protect against unauthorized access to Plaintiffs' and Class Members' Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by the FTC Act.

**G. Defendant Failed to Comply with HIPAA Guidelines.**

101. Defendant is a covered entity and business associate under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

102. Defendant is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology for Economic Clinical Health Act ("HITECH"). See 42 U.S.C. §17921, 45 C.F.R. § 160.103.

---

[40] *Statement of FTC Commissioner Pamela Jones Harbour* (Remarks Before FTC Exploring Privacy Roundtable), *available at* http://ftc.gov/speeches/harbour/091207privacyroundtable.pdf.

103. HIPAA's Privacy Rule or Standards for Privacy of Individually Identifiable Health Information establishes national standards for the protection of health information.

104. HIPAA's Privacy Rule or Security Standards for the Protection of Electronic Protected Health Information establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

105. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

106. "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

107. HIPAA's Security Rule requires Defendant to do the following:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by their workforce.

108. HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendant is

required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

109. HIPAA and HITECH also obligated Defendant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. See 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); see also 42 U.S.C. §17902.

110. The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Defendant to provide notice of the Data Breach to each affected individual "without unreasonable delay *and in no case later than 60 days following discovery of the breach*."[41]

111. HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. See 45 C.F.R. § 164.530(e).

112. HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. See 45 C.F.R. § 164.530(f).

113. HIPAA also requires the Office of Civil Rights ("OCR"), within the Department

---

[41] Breach Notification Rule, U.S. Dep't of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (emphasis added).

of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. See 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material.[42] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.[43]

114. As alleged herein, Defendant's violations of HIPAA and HITECH include, but are not limited to:

a. Failing to maintain adequate security practices, systems, and protocols to prevent data loss;

b. Failing to mitigate the risks of a data breach and loss of data;

c. Failing to ensure the confidentiality and protection of PHI;

d. Failing to implement technical policies and procedures for electronic information systems that maintain ePHI to allow access only to those persons or software programs that have been granted access rights;

e. Failing to implement policies and procedures to prevent, detect, contain, and correct

---

[42] http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html.

[43] https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html

security violations;

f. Failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity or business associate;

g. Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of ePHI;

h. Failing to protect against any reasonably anticipated uses or disclosures of ePHI that are not permitted under the privacy rules regarding individually identifiable health information;

i. Failing to ensure compliance with HIPAA security standard rules by Defendant's workforce and vendors;

j. Impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons; and

k. Failing to require or ensure that Defendant's vendor used appropriate safeguards to prevent the unauthorized disclosure of Plaintiffs' and Class Members' Private Information.

115. While monetary relief may compensate Plaintiffs and Class Members for some of their injuries, injunctive relief is also necessary to ensure Defendant's approach to information security is adequate and appropriate going forward. Defendant still maintains the Private Information of their current and former patients, including Plaintiffs and Class Members. Without the supervision of the Court through injunctive relief, Plaintiffs' and Class Members' Private Information remains at risk of subsequent theft and misuse.

**H. Defendant Failed to Comply with Industry Standards**

116. As alleged above, experts studying cyber security routinely identify entities in

possession of PII and PHI as being particularly vulnerable to cyberattacks because of the value of the Private Information they collect and maintain.

117. The Center for Internet Security's ("CIS") Critical Security Controls ("CSC") recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.

118. The U.S. Government's National Institute of Standards and Technology ("NIST") provides a comprehensive cybersecurity framework that companies of any size can use to evaluate and improve their information security controls.

119. NIST publications include substantive recommendations and procedural guidance pertaining to a broad set of cybersecurity topics including risk assessments, risk management strategies, access controls, training, data security controls, network monitoring, breach detection, and incident response.

120. NIST recommends certain practices to safeguard systems, such as the following:

a. Control who logs on to your network and uses your computers and other devices.

b. Use security software to protect data.

c. Encrypt sensitive data, at rest and in transit.

d. Conduct regular backups of data.

e. Update security software regularly, automating those updates if possible.

f. Have formal policies for safely disposing of electronic files and old devices.

g. Train everyone who uses your computers, devices, and network about cybersecurity.

121. Further still, CISA makes specific recommendations to organizations to guard against cybersecurity attacks, including (a) reducing the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's network and privileged or administrative access requires multi-factor authentication, [e]nsur[ing] that software is up to date, prioritizing updates that address known exploited vulnerabilities identified by CISA[,] [c]onfirm[ing] that the organization's IT personnel have disabled all ports and protocols that are not essential for business purposes," and other steps; (b) taking steps to quickly detect a potential intrusion, including "[e]nsur[ing] that cybersecurity/IT personnel are focused on identifying and quickly assessing any unexpected or unusual network behavior [and] [e]nabl[ing] logging in order to better investigate issues or events[;] [c]onfirm[ing] that the organization's entire network is protected by antivirus/antimalware software and that signatures in these tools are updated," and (c) "[e]nsur[ing] that the organization is prepared to respond if an intrusion occurs," and other steps.[44]

122. Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, or to require the same from Defendant's vendor, including failing to meet or require the minimum standards of the NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS

---

[44] *Shields Up: Guidance for Organizations*, CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY,https://www.cisa.gov/shields-guidance-organizations.

CSC), which are established frameworks for reasonable cybersecurity readiness, and by failing to comply with other industry standards for protecting Plaintiffs' and Class Members' Private Information, resulting in the Data Breach.

123. These foregoing frameworks are existing and applicable industry standards for a business and healthcare provider's obligations to provide adequate data security for its patients' sensitive information. Defendant failed to comply with at least one, or all, of these accepted standards, thereby opening the door to criminals to carry out the Data Breach.

124. Further, proper vetting and routine audits of vendors' data security practices, including vetting of Defendant's cybersecurity practices, could have prevented the Data Breach. Vendor risk assessments or security questionnaires are "one of the best methods for extracting deep cybersecurity insights about any aspects of a vendor's attack surface."[45]

125. Finally, several best practices have been identified that a minimum should be implemented by businesses in possession of Private Information, like Defendant, including but not limited to educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Upon information and belief, Defendant failed to follow these industry best practices and by failing to ensure these security measures by their vendors, including the vendor involved in the Data Breach.

**I. Defendant Failed to Exercise Appropriate Vendor Management**

126. Defendant failed to exercise appropriate oversight and vendor management practices to continuously monitor and ensure the safety of the Private Information it shared with

---

[45] Edward Kost, *Third-Party Risk Management: How to Identify Vulnerable Third-Party Software (Quickly)*, UPGUARD (Sept. 4, 2023), at https://www.upguard.com/blog/how-to-identifyvulnerable-third-party-software.

the vendor that was breached. The vendor's failure to implement basic credential management, authentication processes, encryption, network segmentation, and internal monitoring were basic security failures that should have been discovered by or known to Defendant before the Data Breach.

127. Defendant knew or should have known it was putting Plaintiffs' and Class Members' Private Information at severe risk.

128. At all relevant times, Defendant knew or should have known that patient Private Information, including data belonging to Plaintiffs and Class Members, would be targeted by cybercriminals and ransomware attack groups.

129. Described above, the healthcare industry has been increasingly targeted by cyberattacks, and Defendant is and was well aware of the high risk of data breaches.

130. High profile data breaches in for similar industry leaders in healthcare put them on notice of this fact, *e.g.*, American Medical Collection Agency (25 million patients, March 2019), University of Washington Medicine (974,000 patients, December 2018), Florida Orthopedic Institute (640,000 patients, July 2020), Wolverine Solutions Group (600,000 patients, September 2018), Oregon Department of Human Services (645,000 patients, March 2019), Elite Emergency Physicians (550,000 patients, June 2020), Magellan Health (365,000 patients, April 2020), and BJC Health System (286,876 patients, March 2020), put Defendant on notice that its electronic records would be targeted by cybercriminals, including if in the possession of a vendor.

131. As a particularly salient example, in February 2024—over two years before the Data Breach began—a massive attack on Change Healthcare, a subsidiary of insurer UnitedHealth, disrupted health care operations on an unprecedented national scale, endangering patients' access to care, disrupting critical clinical and eligibility operations, and threatening the solvency of the

nation's provider network.

132. Thus, Defendant knew or should have known the importance of safeguarding the Private Information entrusted to it and of the foreseeable consequences if it's or a vendor's system was breached. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring or from mitigating the consequences of the Data Breach.

133. Despite such knowledge, Defendant failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiffs' and Class Members' private information from cyberattacks, including, but not limited to, adequately vetting, auditing, and monitoring their third-party vendors.

134. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to require and periodically ensure that its vendors adopted, implemented, and maintain adequate security measures to safeguard Plaintiffs' and Class Members' Private Information, including through data encryption and employee training;

b. Failing to adequately monitor the security of vendors' information technology networks and systems;

c. Failure to require and periodically ensure that vendors' network systems had reasonable logging and alerting methods in place to detect unauthorized access;

d. Allowing unauthorized access to Plaintiffs' and Class Members' Private Information provided to their vendors;

e. Failing to fully comply with FTC guidelines for cybersecurity, or ensure vendors' compliance with same, in violation of the FTC Act;

f. Violating, and allowing vendors to violate, HIPAA data security requirements for PHI;

and

g. Failing to require and ensure vendors adhered to industry standards for cybersecurity as discussed above.

135. Defendant negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information by allowing cybercriminals to access the vendor's computer systems that contained unsecured and unencrypted Private Information.

136. Had Defendant remedied the deficiencies in Defendant's vendor's information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, Defendant would have prevented, or at least curtailed, intrusion into the vendor's information storage and security systems and, ultimately, the theft of Plaintiffs' and Class Members' Private Information in the Data Breach

**J. The Data Breach Increases Plaintiffs' and Class Members' Risk of Identity Theft**

137. Upon information and belief, the unencrypted Private Information of Plaintiffs and Class Members will end up further disseminated and sold to criminals on the dark web, as that is the *modus operandi* of hackers.

138. Unencrypted Private Information may also fall into the hands of companies that will use the detailed data for targeted marketing without the approval of Plaintiffs and Class Members.

139. Simply put, unauthorized individuals can easily access the Private Information of Plaintiffs and Class Members because of the Data Breach.

140. Cyberattacks and data breaches at healthcare companies like Defendant are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

141. Researchers have found that among healthcare service providers that experience a data security incident, the death rate among patients increased in the months and years after the attack.[46]

142. Researchers have further found that at healthcare service providers that experienced a data security incident, the incident was associated with deterioration in timeliness and patient outcomes, generally.[47]

143. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

144. Plaintiffs' and Class Members' Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiffs and Class Members and to profit from their misfortune.

145. As a result of Defendant's failure to prevent the Data Breach, Plaintiffs and Class Members have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

a. The loss of the opportunity to control how their Private Information is used;

[46] *See* Nsikan Akpan, Ransomware and Data Breaches Linked to Uptick in Fatal Heart Attacks, PBS (Oct. 24, 2019), https://www.pbs.org/newshour /science/ransomware-and-other-data-breaches-linked-to-uptick-in-fatal-heart-attacks.

[47] *See* Sung J. Choi et al., Data Breach Remediation Efforts and Their Implications for Hospital Quality, 54 HEALTH SERVICES RESEARCH 971, 971-980 (2019), https://onlinelibrary.wiley.com/doi/full/10.1111/1475-6773.13203.

b. The diminution in value of their Private Information;

c. The compromise and continuing publication of their Private Information;

d. Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

e. Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

f. Delay in receipt of tax refund monies;

g. Unauthorized use of stolen Private Information; and

h. The continued risk to their Private Information, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake the appropriate measures to protect the Private Information in its possession.

146. Stolen Private Information is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII alone can be worth up to $1,000.00 depending on the type of information obtained.

147. The value of Plaintiffs' and the Class's Private Information on the black market is considerable. Stolen Private Information trades on the black market for years, and criminals frequently post stolen Private Information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

148. It can take victims years to spot identity theft, giving criminals plenty of time to use that information for cash.

149. One such example of criminals using Private Information for profit is the

development of "Fullz" packages.

150. Cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

151. The development of "Fullz" packages means that stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs and the proposed Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs' and the Class's stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

152. Identity thieves can also use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud. According to Experian, one of the largest credit reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan, change a billing address so the victim no longer receives bills, open new utilities, obtain a mobile phone, open a bank account and write bad checks, use a debit card number to withdraw funds, obtain a new driver's license or ID, and/or use the victim's information in the event of arrest or court

action.

153. Identity thieves can also use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, and/or rent a house or receive medical services in the victim's name.

154. The Social Security Administration has similarly warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[48] Such fraud may go undetected until debt collection calls commence months, or even years later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[49] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected because one was already filed on their behalf.

155. Further, an individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[50]

156. This was a financially motivated Data Breach, as the only reason the

---

[48] *Id.*
[49] *Id. at* 4.
[50] Brian Naylor, Victims of Social Security Number Theft Find It's Hard to Bounce Back, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

cybercriminals go through the trouble of running a targeted cyberattack against companies like Defendant is to get information that they can monetize by selling on the black market for use in the kinds of criminal activity described herein. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."

157. Indeed, a Social Security number, date of birth, and full name can sell for $60 to $80 on the digital black market.[51] "[I]f there is reason to believe that your personal information has been stolen, you should assume that it can end up for sale on the dark web."[52]

158. These risks are both certainly impending and substantial. As the FTC has reported, if hackers get access to PHI/PII, *they will use it*.[53]

159. Approximately 21% of victims did not realize their identity has been compromised until more than two years after it happened.[54] This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[55]

160. Identity theft victims must spend countless hours and large amounts of money

---

[51] Michael Kan, Here's How Much Your Identity Goes for on the Dark Web, (Nov. 15, 2017), https://www.pcmag.com/news/heres-how-much-your-identity-goes-for-on-the-dark-web.
[52] Dark Web Monitoring: What You Should Know, Consumer Federation of America (Mar. 19, 2019), https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/.
[53] *Id.*
[54] *See* Medical ID Theft Checklist, https://www.identityforce.com/blog/medical-id-theft-checklist-2
[55] The Potential Damages and Consequences of Medical Identify Theft and Healthcare Data Breaches ("Potential Damages"), EXPERIAN, https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf

repairing the impact to their credit as well as protecting themselves in the future.[56]

161. Defendant's failure to properly notify Plaintiffs and Class Members of the Data Breach exacerbated Plaintiffs' and the Class's injury by depriving them of the earliest ability to take appropriate measures to protect their Private Information and take other necessary steps to mitigate the harm caused by the Data Breach.

162. Defendant's purported disclosure in the Notice Letters amounts to no real disclosure at all, as it fails to inform Plaintiffs and Class Members of the Data Breach's critical facts with any degree of specificity. Without these details, Plaintiffs' and Class Members' ability to mitigate the harms resulting from the Data Breach was and is severely diminished.

163. Further, the Notice Letters offer no substantive steps to help victims like Plaintiffs and Class Members to protect themselves other than providing credit monitoring for a short period of time—an offer that is woefully inadequate considering the lifelong increased risk of fraud and identity theft Plaintiffs and Class Members now face as a result of the Data Breach.

### K. Loss of Time to Mitigate the Risk of Identity Theft and Fraud

164. As a result of the recognized risk of identity theft, when a data breach occurs and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm.

165. Thus, due to the actual and imminent risk of identity theft, Plaintiffs and Class

[56] Guide for Assisting Identity Theft Victims, FED. TRADE COMM'N, 4 (Sept. 2013), http://www.consumer.ftc.gov/articles/pdf-0119-guide-assisting-id-theft-victims.pdf.

Members must monitor their financial accounts for many years to mitigate the risk of identity theft.

166. Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as changing passwords and resecuring their own computer systems.

167. Plaintiffs' mitigation efforts are consistent with the GAO Report in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[57]

168. Plaintiffs' mitigation efforts are also consistent with the steps the FTC recommends data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[58]

**L. Diminution of Value of Private Information**

169. Private Information is valuable property.[59] Its value is axiomatic, considering the value of Big Data in corporate America and that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates, beyond doubt, that Private Information has considerable market value.

---

[57] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf

[58] *See* Federal Trade Commission, Identity Theft.gov, https://www.identitytheft.gov/Steps

[59] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," at 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf.

170. The Private Information stolen in the Data Breach is significantly more valuable than the loss of, say, credit card information in a large retailer data breach. Victims affected by those retailer breaches could avoid much of the potential future harm by simply cancelling credit or debit cards and obtaining replacements. The information stolen in the Data Breach is difficult, if not impossible, to change.

171. This kind of data, as one would expect, demands a much higher price on the dark web. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[60]

172. Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[61]

173. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[62] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[63] [64] Consumers who agree to provide their web browsing history to the Nielsen Corporation can

---

[60] Tim GreeneAnthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers, IT WORLD (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hackpersonal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html
[61] *See*, e.g., John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).
[62] *See* Ashiq Ja, Hackers Selling Healthcare Data in the Black Market, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/
[63] https://www.latimes.com/business/story/2019-11-05/column-data-brokers
[64] https://datacoup.com/

receive up to $50 a year.[65]

174. As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby Private additional loss of value.

175. The fraudulent activity resulting from the Data Breach may not come to light for years.

176. Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiffs and Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

177. Defendant was, or should have been, fully aware of the unique type and the significant volume of data that Defendant entrusted to the vendor, amounting to thousands of individuals detailed Private Information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

178. The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members when entrusted to vendors, including the vendor involved in the Data Breach.

---

[65] https://www.thepennyhoarder.com/make-money/nielsen-panel/#:~:text=Sign%20up%20to%20join%20the,software%20installed%20on%20your%20computer (

## M. The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary

179. Given the type of targeted attack in this case, the sophisticated criminal activity, the volume of data compromised in this Data Breach, and the sensitive type of Private Information involved in this Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes—e.g., opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

180. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

181. Consequently, Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

182. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft resulting from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear, but for Defendant's failure to safeguard their Private Information.

## N. Loss of the Benefit of the Bargain

183. Furthermore, Defendant's poor data security deprived Plaintiffs and Class Members of the benefit of their bargain. When agreeing to pay Defendant for the provision of its

services, Plaintiffs and other reasonable patients understood and expected that they were, in part, paying for the service and necessary data security to protect the Private Information when, in fact, Defendant did not provide the expected data security. Accordingly, Plaintiffs and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

**O. Plaintiffs' Experiences and Injuries**

***Plaintiff Brandon James'***

184. Plaintiff James received radiological imaging services from a healthcare provider affiliated with Defendant that provided his Private Information to Defendant. Thus, Plaintiff James is a customer of Defendant.

185. Defendant collected, stored, and maintained the Private Information of Plaintiff James and then shared it with the vendor involved in the Data Breach.

186. Plaintiff James received a Data Breach Notice Letter from Defendant dated June 12, 2026.

187. Plaintiff James' Private Information was required to be disclosed to Defendant. Defendant thereafter obtained and maintained the Private Information of Plaintiff James.

188. As a result, Plaintiff James was injured by the Data Breach.

189. Plaintiff James is very careful about the privacy and security of his Private Information. He does not knowingly transmit his Private Information over the internet in an unsafe manner. He is careful to store any documents containing his Private Information in a secure location.

190. Plaintiff James provided his Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies,

as well as state and federal law. Defendant obtained and continues to maintain Plaintiff James's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

191. Plaintiff James reasonably understood that a portion of the funds paid to Defendant would be used to pay for adequate cybersecurity and protection of Private Information.

192. The Data Breach compromised Plaintiff James's Private Information.

193. Plaintiff James has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, Defendant directed Plaintiff to take those steps in its breach notice. Thus far, to mitigate the risks created by the Data Breach, Plaintiff James has lost at least five hours researching the Data Breach and reviewing his accounts for suspicious activity.

194. And in the aftermath of the Data Breach, Plaintiff suffered from a spike in targeted spam and phishing and scam emails, phone calls, and text messages. Worryingly, these spam and phishing messages often related to medical care.

195. Plaintiff James fears for his personal financial security and worries about what information was exposed in the Data Breach.

196. Because of the Data Breach, Plaintiff James has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, these injuries are precisely the type of injuries that the law contemplates and addresses.

197. Plaintiff James suffered actual injury from the exposure and theft of his Private Information—which violates his rights to privacy.

198. Plaintiff James suffered actual injury in the form of damages to and diminution in

the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

199. As a patient, Plaintiff James suffered actual injury and lost the "benefit of the bargain" because Plaintiff James (or his third-party agent) paid Defendant for services and reasonable data security—but Defendant then cut corners and declined to provide the bargained for data security.

200. Plaintiff James suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff James's Private Information right in the hands of criminals.

201. Because of the Data Breach, Plaintiff James anticipates spending considerable amounts of time and money to try and mitigate his injuries.

202. Today, Plaintiff James has a continuing interest in ensuring that his Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Plaintiff Rebecca Ortega***

203. Plaintiff Ortega received radiological imaging services from a healthcare provider affiliated with Defendant that provided her Private Information to Defendant. Thus, Plaintiff Ortega is a customer of Defendant.

204. Defendant collected, stored, maintained the Private Information of Plaintiff Ortega and then shared it with the vendor involved in the Data Breach.

205. Plaintiff Ortega received a Data Breach Notice Letter from Defendant dated June 12, 2026.

206. Plaintiff Ortega's Private Information was required to be disclosed  was required

to disclose her Private Information to Defendant. Defendant thereafter obtained and maintained the Private Information of Plaintiff Ortega.

207. As a result, Plaintiff Ortega was injured by the Data Breach.

208. Plaintiff Ortega is very careful about the privacy and security of her Private Information. She does not knowingly transmit her Private Information over the internet in an unsafe manner. She is careful to store any documents containing her Private Information in a secure location.

209. Plaintiff Ortega provided her Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff Ortega's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

210. Plaintiff Ortega reasonably understood that a portion of the funds paid to Defendant would be used to pay for adequate cybersecurity and protection of Private Information.

211. The Data Breach compromised Plaintiff Ortega's Private Information.

212. Plaintiff Ortega has spent—and will continue to spend—significant time and effort monitoring her accounts to protect herself from identity theft. After all, Defendant directed Plaintiff to take those steps in its breach notice. Thus far, to mitigate the risks created by the Data Breach, Plaintiff Ortega has lost approximately 60 hours monitoring her bank account, monitoring her credit monitoring service, researching the Data Breach, calling the hotline number, and dealing with the spike in targeted spam and scams.

213. And in the aftermath of the Data Breach, Plaintiff Ortega suffered from a spike in spam and scam emails, text messages, and phone calls.

214. The scam phone calls were so invasive that Plaintiff Ortega was forced to purchase a new cellular phone with a new telephone number in June 2026. She incurred out-of-pocket costs to pay for a new cell phone from a new wireless carrier.

215. Subsequent to the Data Breach, Plaintiff Ortega received several notifications from her credit monitoring service and her bank that her Private Information was found exposed on the Dark Web including her phone number and Social Security number.

216. Plaintiff Ortega fears for her personal financial security and worries about what information was exposed in the Data Breach.

217. Because of the Data Breach, Plaintiff Ortega has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, these injuries are precisely the type of injuries that the law contemplates and addresses.

218. Plaintiff Ortega suffered actual injury from the exposure and theft of her Private Information—which violates her rights to privacy.

219. Plaintiff Ortega suffered actual injury in the form of damages to and diminution in the value of her Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

220. As a patient, Plaintiff Ortega suffered actual injury and lost the "benefit of the bargain" because Plaintiff Ortega (or her third-party agent) paid Defendant for services and reasonable data security—but Defendant then cut corners and declined to provide the bargained for data security.

221. Plaintiff Ortega suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data

Breach placed Plaintiff Ortega's Private Information right in the hands of criminals.

222. Because of the Data Breach, Plaintiff Ortega anticipates spending considerable amounts of time and money to try and mitigate her injuries.

223. Today, Plaintiff Ortega has a continuing interest in ensuring that her Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Plaintiff Jayson Moreno***

224. Plaintiff Moreno received radiological imaging services from a healthcare provider affiliated with Defendant that provided his Private Information to Defendant. Thus, Plaintiff Moreno is a patient of Defendant.

225. Thus, Defendant collected, stored, and maintained the Private Information of Plaintiff Moreno and then shared it with the vendor involved in the Data Breach.

226. Plaintiff Moreno received a Data Breach Notice Letter from Defendant dated June 12, 2026.

227. Plaintiff used his credit card to pay for the radiological imaging services that he received. Thus, on information and belief, Defendant obtained his financial account information including his credit card information.

228. Thus, Plaintiff Moreno's Private Information was required to be disclosed to Defendant. Defendant thereafter obtained and maintained the Private Information of Plaintiff Moreno.

229. As a result, Plaintiff Moreno was injured by the Data Breach.

230. Plaintiff Moreno is very careful about the privacy and security of his Private Information. He does not knowingly transmit his Private Information over the internet in an

unsafe manner. He is careful to store any documents containing his Private Information in a secure location.

231. Plaintiff Moreno provided his Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff Moreno's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

232. Plaintiff Moreno reasonably understood that a portion of the funds paid to Defendant would be used to pay for adequate cybersecurity and protection of Private Information.

233. The Data Breach compromised Plaintiff Moreno's Private Information.

234. Plaintiff Moreno has ***already*** suffered from identity theft and fraud—whereby cybercriminals stole his identity and placed fraudulent charges on his Capital One credit card. Notably, these fraudulent charges occurred after the Data Breach on the exact same credit card that Plaintiff used to pay for medical and/or radiological imaging services. Specifically:

a. Cybercriminals placed a fraudulent charge of $22.46 for the merchant "Panera Bread" on his credit card on April 20, 2026.

b. Cybercriminals placed a fraudulent charge of $50.91 for the merchant "AM* ACKERMANSHOP.COM" on his credit card on April 29, 2026.

235. To cancel the fraudulent charges, Plaintiff was forced to contact his credit card company and submit an official fraud report. On May 25, 2026, Plaintiff received an email from that company confirming his "recent fraud report" and notifying him that "We immediately shut down your card so fraudsters can't use it and issued you a new one—we'll email you when it's on the way."

236. Plaintiff Moreno has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, Defendant directed Plaintiff to take those steps in its breach notice. Thus far, to mitigate the risks created by the Data Breach, Plaintiff Moreno has lost time dealing with fraudulent charges, monitoring his credit, and reviewing his bank account for suspicious activity.

237. Plaintiff Moreno suffered actual injury from the exposure and theft of his Private Information—which violates his rights to privacy.

238. Plaintiff Moreno suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

239. As a patient, Plaintiff Moreno suffered actual injury and lost the "benefit of the bargain" because Plaintiff Moreno (or his third-party agent) paid Defendant for services and reasonable data security—but Defendant then cut corners and declined to provide the bargained for data security.

240. Plaintiff Moreno suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Moreno's Private Information right in the hands of criminals.

241. Because of the Data Breach, Plaintiff Moreno anticipates spending considerable amounts of time and money to try and mitigate his injuries.

242. Today, Plaintiff Moreno has a continuing interest in ensuring that his Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Plaintiff Aaron Ault***

243. Plaintiff Ault received radiological imaging services from a healthcare provider that provided his Private Information to Defendant. Thus, Plaintiff Ault is a customer of Defendant.

244. Defendant collected, stored, and maintained the Private Information of Plaintiff Ault and then shared it with the vendor involved in the Data Breach.

245. Plaintiff Ault received a Data Breach Notice Letter from Defendant dated June 12, 2026.

246. Thus, Plaintiff Ault's Private Information was required to be disclosed to Defendant. Defendant thereafter obtained and maintained the Private Information of Plaintiff Ault.

247. As a result, Plaintiff Ault was injured by the Data Breach.

248. Plaintiff Ault is very careful about the privacy and security of his Private Information. He does not knowingly transmit his Private Information over the internet in an unsafe manner. He is careful to store any documents containing his Private Information in a secure location.

249. Plaintiff Ault provided his Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff Ault's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

250. Plaintiff Ault reasonably understood that a portion of the funds paid to Defendant would be used to pay for adequate cybersecurity and protection of Private Information.

251. The Data Breach compromised Plaintiff Ault's Private Information.

252. Plaintiff Ault has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, Defendant directed Plaintiff to take those steps in its breach notice. Thus far, to mitigate the risks created by the Data Breach, Plaintiff Ault has lost approximately 15 hours trying to resolve fraudulent accounts and another four hours reviewing his credit and financial accounts for signs of suspicious activity.

253. After the Data Breach, Plaintiff Ault suffered from repeated identity theft when cybercriminals applied for approximately four different fraudulent accounts with various banks. On information and belief, the cybercriminals used the Private Information that was exposed by Defendant during the Data Breach. After all, the Data Breach exposed, *inter alia*, his name, date of birth, address, financial account information, and Social Security number—which are the exact types of data that identity thieves need to open a fraudulent credit card or account.

254. From approximately mid-April 2026 through early July 2026, Plaintiff Ault suffered from identity theft when cybercriminals attempted to open fraudulent bank accounts using his identity with Bank of America and Citi Bank. Plaintiff Ault learned about this fraudulent activity after receiving letters from Bank of America and Citi Bank. Thereafter, Plaintiff Ault spent time contacting Bank of America and Citi Bank to try and resolve the identity theft.

255. Plaintiff Ault suffered from identity theft when cybercriminals successfully opened a fraudulent credit card with Wells Fargo using his identity on or around May 1, 2026. Plaintiff Ault learned about this fraudulent activity after receiving a letter from Wells Fargo. Thereafter, Plaintiff Ault spent time contacting Wells Fargo to try and resolve the identity theft.

256. Plaintiff Ault received a response letter dated June 12, 2026, from the "Fraud Department" at Wells Fargo Bank, N.A. confirming that:

a. "Resolution of claim for application submitted on 05/01/2026[.]"

b. "Dear AARON AULT, We have received your request and found the application was unauthorized."

c. "As a result, we have instructed the consumer reporting agencies listed below to remove this inquiry and/or account from your credit file."

d. "Because your personal information was compromised by fraud, we recommend you contact the credit reporting agencies above."

257. `Plaintiff Ault received a letter dated July 7, 2026, from Bank of America regarding the "claim" submitted on May 10, 2026. Therein, Bank of America stated that:

a. "Based on the information available to us, we're unable to approve your claim."

b. "If you have additional information that you're able to provide, we'll be glad to reopen and reconsider your claim and investigate. The information that may help us in the decisioning of your claim can be found on the document(s) we've included.

c. "Please complete, sign, and return the enclosed Fraud Statement of Claimant form along with any of the document(s) you have available[.]"

258. On or around July 15, 2026, Plaintiff Ault then spent time completing the requested "Fraud Statement of Claimant" form for Bank of America.

259. Plaintiff Ault received a letter dated July 20, 2026, from "Citibank Fraud Prevention" about his "Identity Theft Claim." Therein, Citibank informed him that:

a. "We have completed our investigation of your fraud claim which has been honored."

b. "We were able to confirm the account(s) in question were opened without your knowledge and consent. Notification has been forwarded to the credit reporting agencies to correct any reporting associated with activity on the account(s)."

260. Plaintiff Ault received a notification from his monitoring service on July 4, 2026,

warning him that "Dark web activity detected" and that the service had detected "unusual activity on the dark web regarding your personal information." It then warned Plaintiff Ault to "defend yourself against potential fraud or identity theft."

261. Plaintiff Ault has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft.

262. And in the aftermath of the Data Breach, Plaintiff suffered from a spike in spam and scam text messages and phone calls—up to approximately 5–10 per day—including suspicious and targeted calls purportedly about health insurance.

263. Plaintiff Ault fears for his personal financial security and worries about what information was exposed in the Data Breach.

264. Because of the Data Breach, Plaintiff Ault has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, these injuries are precisely the type of injuries that the law contemplates and addresses.

265. Plaintiff Ault suffered actual injury from the exposure and theft of his Private Information—which violates his rights to privacy.

266. Plaintiff Ault suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

267. As a patient, Plaintiff Ault suffered actual injury and lost the "benefit of the bargain" because Plaintiff Ault (or his third-party agent) paid Defendant for services and reasonable data security—but Defendant then cut corners and declined to provide the bargained for data security.

268. Plaintiff Ault suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Ault's Private Information right in the hands of criminals.

269. Because of the Data Breach, Plaintiff Ault anticipates spending considerable amounts of time and money to try and mitigate his injuries.

270. Today, Plaintiff Ault has a continuing interest in ensuring that his Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Plaintiff Richard Freiberg's Experiences and Injuries***

271. Plaintiff Freiberg received radiological imaging services from a healthcare provider affiliated with Defendant that provided his Private Information to Defendant. Thus, Plaintiff Freiberg is a customer of Defendant.

272. Defendant collected, stored, and maintained the Private Information of Plaintiff James and then shared it with the vendor involved in the Data Breach.

273. Plaintiff Freiberg received a Data Breach Notice Letter from Defendant dated June 12, 2026.

274. Plaintiff Freiberg's Private Information was required to be disclosed to Defendant. Defendant thereafter obtained and maintained the Private Information of Plaintiff Freiberg.

275. As a result, Plaintiff Freiberg was injured by the Data Breach.

276. Plaintiff Freiberg is very careful about the privacy and security of his Private Information. He does not knowingly transmit his Private Information over the internet in an unsafe manner. He is careful to store any documents containing his Private Information in a secure location.

277. Plaintiff Freiberg provided his Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff Freiberg's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

278. Plaintiff Freiberg reasonably understood that a portion of the funds paid to Defendant would be used to pay for adequate cybersecurity and protection of Private Information.

279. The Data Breach compromised Plaintiff Freiberg's Private Information.

280. Plaintiff Freiberg pays approximately $25 per month for identity monitoring services.

281. After the Data Breach, Plaintiff Freiberg received notifications from his identity monitoring service warning him that his Private Information was found on the Dark Web.

282. Plaintiff Freiberg received an email notification from a credit card company on July 25, 2026, notifying him about a fraudulent charge for $2.00 on July 25, 2026, with the merchant name "FACEBK[.]" Thereafter, Plaintiff Freiberg reported the charge as fraudulent and was then forced to wait for a new credit card.

283. Plaintiff Freiberg received a notification from his identity monitoring service warning him that "[a] short-term loan application was submitted using some of your personal information" which was detected by the credit bureau "DataX" on May 25, 2026. The notification further warned him that the short-term loan "may or may not have been approved."

284. Plaintiff Freiberg did not apply for the "short-term loan" and did not authorize anyone else to apply for the "short-term loan" using his identity. Thus, cybercriminals stole his identity to commit identity theft.

285. On information and belief, the cybercriminals used the Private Information that was exposed by Defendant during the Data Breach. After all, the Data Breach exposed, *inter alia*, his name, date of birth, address, financial account information, and Social Security number—which are the exact types of data that identity thieves need to open a fraudulent credit card or account.

286. Thereafter, on May 26, 2026, Plaintiff Freiberg paid $8.90 out-of-pocket to the United States Postal Service to send a letter through "First-Class Mail" to the credit bureau DataX to formally report the "short-term loan" as fraudulent.

287. Plaintiff Freiberg has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, Defendant directed Plaintiff to take those steps in its breach notice. Thus far, to mitigate the risks created by the Data Breach, Plaintiff Freiberg has lost 10 hours researching the data breach and trying to mitigate the fallout of identity theft. Plaintiff Freiberg also loses approximately four hours every month reviewing his credit card statement and bank accounts for signs of suspicious activity.

288. Beginning in or around April 2026, Plaintiff suffered from a spike in spam and scam emails, text messages and phone calls (including up to 30 per day).

289. Plaintiff Freiberg fears for his personal financial security and worries about what information was exposed in the Data Breach.

290. Because of the Data Breach, Plaintiff Freiberg has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, these injuries are precisely the type of injuries that the law contemplates and addresses.

291. Plaintiff Freiberg suffered actual injury from the exposure and theft of his Private

Information—which violates his rights to privacy.

292. Plaintiff Freiberg suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

293. As a patient, Plaintiff Freiberg suffered actual injury and lost the "benefit of the bargain" because Plaintiff Freiberg (or his third-party agent) paid Defendant for services and reasonable data security—but Defendant then cut corners and declined to provide the bargained for data security.

294. Plaintiff Freiberg suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Freiberg's Private Information right in the hands of criminals.

295. Because of the Data Breach, Plaintiff Freiberg anticipates spending considerable amounts of time and money to try and mitigate his injuries.

296. Today, Plaintiff Freiberg has a continuing interest in ensuring that his Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Plaintiff Rosemary Jones' Experiences and Injuries***

297. Plaintiff Jones received radiological imaging services from a healthcare provider affiliated with Defendant that provided her Private Information to Defendant. Thus, Plaintiff Jones is a customer of Defendant.

298. Defendant collected, stored, and maintained the Private Information of Plaintiff James and then shared it with the vendor involved in the Data Breach.

299. Plaintiff Jones received a Data Breach Notice Letter from Defendant dated June

12, 2026.

300. Thus, Plaintiff Jones' Private Information was required to be disclosed to Defendant. Defendant thereafter obtained and maintained the Private Information of Plaintiff Jones.

301. As a result, Plaintiff Jones was injured by the Data Breach.

302. Plaintiff Jones is very careful about the privacy and security of her Private Information. She does not knowingly transmit her Private Information over the internet in an unsafe manner. She is careful to store any documents containing her Private Information in a secure location.

303. Plaintiff Jones provided her Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff Jones's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

304. Plaintiff Jones reasonably understood that a portion of the funds paid to Defendant would be used to pay for adequate cybersecurity and protection of Private Information.

305. Through its Data Breach, Defendant compromised Plaintiff Jones's Private Information.

306. Plaintiff Jones has spent—and will continue to spend—significant time and effort monitoring her accounts to protect herself from identity theft. After all, Defendant directed Plaintiff to take those steps in its breach notice. Thus far, to mitigate the risks created by the Data Breach, Plaintiff Jones has lost two hours researching the Data Breach.

307. In or around April 2026, Plaintiff suffered from a spike in spam and scam emails,

text messages and phone calls—including suspicious messages involving healthcare and her specific medical prescriptions.

308. Plaintiff Jones fears for her personal financial security and worries about what information was exposed in the Data Breach.

309. Because of the Data Breach, Plaintiff Jones has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, these injuries are precisely the type of injuries that the law contemplates and addresses.

310. Plaintiff Jones suffered actual injury from the exposure and theft of her Private Information—which violates her rights to privacy.

311. Plaintiff Jones suffered actual injury in the form of damages to and diminution in the value of her Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

312. As a patient, Plaintiff Jones suffered actual injury and lost the "benefit of the bargain" because Plaintiff Jones (or her third-party agent) paid Defendant for services and reasonable data security—but Defendant then cut corners and declined to provide the bargained for data security.

313. Plaintiff Jones suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Jones's Private Information right in the hands of criminals.

314. Because of the Data Breach, Plaintiff Jones anticipates spending considerable amounts of time and money to try and mitigate her injuries.

315. Today, Plaintiff Jones has a continuing interest in ensuring that her Private

Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

## CLASS ALLEGATIONS

316. Plaintiffs bring this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of the following Class:

> All persons in the United States who were impacted by Defendant's Data Breach, including those who were sent a Notice Letter from Defendant ("Class").

317. Specifically excluded from the Class are Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, principals, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

318. Plaintiffs reserve the right to amend the Class definitions above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

319. This action may be certified as a class action because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

320. Numerosity: The Class is so numerous that joinder of all Class Members is impracticable. Although the precise number of such persons is unknown, and the facts are presently within the sole knowledge of Defendant, upon information and belief, Plaintiffs estimate that the Class is comprised of thousands of Class Members, if not more. The Class is sufficiently numerous to warrant certification.

321. Typicality of Claims: Plaintiffs' claims are typical of those of other Class Members because Plaintiffs, like the unnamed Class Member, had their Private Information compromised

as a result of the Data Breach. Plaintiffs are members of the Class, and their claims are typical of the claims of the members of the Class. The harm suffered by Plaintiffs are similar to that suffered by all other Class Members which were caused by the same misconduct by Defendant.

322. Adequacy of Representation: Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have no interests antagonistic to, nor in conflict with, the Class. Plaintiffs have retained competent counsel who are experienced in consumer and commercial class action litigation, including data privacy cases, and who will prosecute this action vigorously.

323. Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class Members are relatively small, the expense and burden of individual litigation make it impossible for individual Class Members to seek redress for the wrongful conduct asserted herein. If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

324. Predominant Common Questions: The claims of all Class Members present common questions of law or fact, which predominate over any questions affecting only individual Class Members, including:

a. Whether Defendant and its vendor failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

b. Whether Defendant's vendor's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

c. Whether Defendant's storage of Plaintiffs' and Class Member's Private Information and entrusting that information to the vendor was done in a negligent manner;

d. Whether Defendant had a duty to protect and safeguard Plaintiffs' and Class Members' Private Information;

e. Whether Defendant's conduct was negligent;

f. Whether Defendant's conduct violated Plaintiffs' and Class Members' privacy;

g. Whether Defendant took sufficient steps to secure individuals' Private Information, including in the possession of its vendor;

h. Whether Defendant was unjustly enriched; and

i. The nature of relief, including damages and equitable relief, to which Plaintiffs and Class Members are entitled.

325. Declaratory and Injunctive Relief. Defendant has acted and/or refused to act on grounds that apply generally to the Class, making declaratory and injunctive relief appropriate with respect to the Class under Fed. R. Civ. P. 23(b)(2).

326. Ascertainability. Members of the Class are ascertainable. Class membership is defined using objective criteria, and Class Members may be readily identified through Defendant's books and records.

327. Information concerning Defendant's policies is available from Defendant's records.

328. Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

329. The prosecution of separate actions by individual members of the Class would run

the risk of inconsistent or varying adjudications and establish incompatible standards of conduct for Defendant. Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

330. Given that Defendant had not indicated any changes to its conduct or security measures, monetary damages are insufficient and there is no complete and adequate remedy at law.

## CAUSES OF ACTION
## COUNT I
## NEGLIGENCE
**(On Behalf of Plaintiffs and the Class)**

331. Plaintiffs incorporate by reference and re-alleges each and every allegation set forth above in paragraphs 1 through 330 as though fully set forth herein.

332. Plaintiffs bring this claim individually and on behalf of the Class Members.

333. Defendant knowingly collected, came into possession of, and maintained Plaintiffs' and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties, including when it shared the Private Information with its vendor involved in the Data Breach.

334. Defendant's duty also included a responsibility to implement processes by which they could detect and analyze a breach of their third-party vendors' security systems quickly and to give prompt notice to those affected in the case of a cyberattack.

335. Defendant knew or should have known of the risks inherent in sharing the Private Information of Plaintiffs and Class Members with the vendor involved in the Data Breach and the importance of adequate security by the vendor. Defendant knew or should have known the vendor would be an attractive target for and was susceptible to cyberattacks.

336. Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards, applicable standards of care from statutory authority like Section 5 of the FTC Act and HIPPA and other requirements therein, and to ensure that its systems and networks, and those belonging to third-party vendors, and the personnel responsible for them, adequately protected individuals' Private Information.

337. Defendant owed a duty of care to Plaintiffs and Class Members whose Private Information was entrusted to Defendant. Defendant's duties included, but were not limited to, the following:

a. To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in its and Defendant's vendors' possession;

b. To design, maintain, oversee, and test vendors' security systems to ensure that the Private Information in vendors' possession was adequately secured and protected;

c. To require and ensure the vendors adequately safeguarded the Private Information by using reasonable and adequate security procedures and systems compliant with industry standards;

d. To have procedures in place to prevent the loss or unauthorized dissemination of Private Information shared with vendors;

e. To employ reasonable security measures and otherwise protect the Private Information of Plaintiffs and Class Members pursuant to HIPAA and the FTC Act;

f. To require and continuously verify vendors implemented processes to quickly detect a data breach and to timely act on warnings about data breaches; and

g. To promptly notify Plaintiffs and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

338. Defendant's duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measure to protect confidential data.

339. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and the patients. Defendant was in a position to ensure that its systems, and those belonging to its third-party vendors, were sufficient to protect against the foreseeable risk of harm to Plaintiffs and Class Members from a data breach.

340. Plaintiffs' and Class Members' willingness to entrust Defendant with their Private Information was predicated on the understanding that Defendant would take adequate security precautions, including with respect to their third-party vendors like the vendor involved in the Data Breach. Only Defendant and that vendor had the ability to protect the vendor's systems (and the Private Information that it stored on them) from attack and the exfiltration of that Private Information in the files copied from the vendor's system.

341. Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

342. Defendant also had independent duties under state laws that required Defendant to reasonably safeguard Plaintiffs and Class Members' Private Information and promptly notify them of the Data Breach

343. Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class Members' Private Information shared with the vendor involved in the Data

Breach.

344. Defendant, by its actions and/or omissions, breached its duty of care by failing to require and verify that the vendor involved in the Data Breach provided fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiffs and Class Members.

345. Defendant, by its actions and/or omissions, breached its duty of care by failing to promptly identify the Data Breach and then failing to provide prompt notice of the Data Breach to the persons whose Private Information was compromised.

346. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to exercise adequate oversight of the vendor involved in the Data Breach by ensuring it adopted reasonable data security measures, practices, and protocols to protect Plaintiffs' and Class Members' Private Information from being accessed and exfiltrated in the Data Breach;

b. Sharing its customers' Private Information with a company that Defendant should have known did not have adequate systems, practices, and protocols in place to protect it from unauthorized disclosure;

c. Failing to implement data security systems, practices, and protocols sufficient to protect customers' Private Information;

d. Failing to comply, or require and verify the vendor involved in the Data Breach complied, with industry-standard data security measures;

e. Failing to require and verify that the vendor involved in the Data Breach adopt, implement, and maintain adequate practices and protocols to promptly determine that

Plaintiffs' and Class Members' Private Information had been compromised in the Data Breach; and

f. Failing to require and verify that the vendor involved in the Data Breach adopt, implement, and maintain adequate practices and protocols to timely notify Plaintiffs and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

347. It was foreseeable that the failure to adequately safeguard Plaintiffs' and Class Members' Private Information would result in injuries to Plaintiffs and Class Members.

348. Defendant's breach of duties owed to Plaintiffs and Class Members caused Plaintiffs' and Class Members' Private Information to be compromised and exfiltrated, as alleged herein.

349. But for Defendant's negligent conduct and breach of the above-described duties owed to Plaintiffs and Class Members, their Private Information would not have been compromised.

350. As a result of Defendant's failure to timely notify Plaintiffs and Class Members that their Private Information had been compromised, Plaintiffs and Class Members are unable to take the necessary precautions to mitigate damages by preventing future fraud.

351. As a direct and proximate result of Defendant's inadequate security and the resulting Data Breach, Plaintiffs suffered and will continue to suffer significant injuries, including, but not limited to (a) loss of privacy; (b) misuse of Private Information misappropriation of their identity, name and likeness; (c) fraud and identity theft from the misuse of their stolen Private Information; (d) diminution in the value of their Private Information due to the loss of security, confidentiality, and privacy; (e) lost value of their Private Information; (f)

emotional and mental distress and anguish resulting from the access, theft and posting of their Private Information; (g) disruption of their medical care and treatment; (h) lost time, effort, and expense responding to and preventing the threats and harm posed by the Data Breach; and (i) a continued substantial and imminent risk of the misuse of their Private Information.

352. Plaintiffs and the Class seek all monetary and non-monetary relief allowed by law, including any: economic damages; damages for emotional and mental anguish; nominal damages; enhanced or treble damages available under the law; court costs; reasonable and necessary attorneys' fees.

**COUNT II**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiffs and the Class)**

353. Plaintiffs incorporate by reference and re-alleges each and every allegation set forth above in paragraphs 1 through 330 as though fully set forth herein.

354. Pursuant to Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

355. Section 5 of the FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. 15 U.S.C. § 45(a)(1).

356. The harms that occurred as a result of the Data Breach are the types of harms the FTCA was intended to protect against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harms as those suffered by Plaintiffs and

Class Members here.

357. Plaintiffs and Class Members are within the class of persons these federal laws were designed to protect.

358. Defendant is a covered entity under HIPAA and had a duty to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 1 64.530(c)(l). Defendant likewise had a duty to render the electronic PHI they maintained unusable, unreadable, or indecipherable to unauthorized individuals by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without the use of a confidential process or key." *See* 45 C.F.R. § 164.304 (definition of "encryption").

359. As an entity that receive patient information, Defendant and its vendor are business associates under HIPAA. Business associates also have legal obligations to implement administrative, technical, and physical safeguards. 42 U.S.C. § 17931 (applying security requirements to business associates and incorporating security requirements into business associate agreements between business associates and covered entities); see also 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards); 42 U.S.C. § 17902.

360. Defendant implemented inadequate data security measures and violated the FTCA and HIPAA by:

a. Failing to exercise adequate oversight of the vendor involved in the Data Breach by ensuring it adopted reasonable data security measures, practices, and protocols to

protect Plaintiffs' and Class Members' Private Information from being accessed and exfiltrated in the Data Breach;

b. Sharing the patients' Private Information with a company that Defendant should have known did not have adequate systems, practices, and protocols in place to protect it from unauthorized disclosure;

c. Failing to implement data security systems, practices, and protocols sufficient to protect patients' Private Information;

d. Failing to comply, or require and verify the vendor involved in the Data Breach complied, with industry-standard data security measures;

e. Failing to require and verify that the vendor involved in the Data Breach adopt, implement, and maintain adequate practices and protocols to promptly determine that Plaintiffs' and Class Members' Private Information had been compromised in the Data Breach; and

f. Failing to require and verify that the vendor involved in the Data Breach adopt, implement, and maintain adequate practices and protocols to timely notify Plaintiffs and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

361. Defendant's violations of the FTCA and HIPAA constitute negligence *per se*.

362. As a direct and proximate result of Defendant's inadequate security and the resulting Data Breach, Plaintiffs suffered and will continue to suffer significant injuries, including, but not limited to (a) loss of privacy; (b) misuse of Private Information misappropriation of their identity, name and likeness; (c) fraud and identity theft from the misuse of their stolen Private Information; (d) diminution in the value of their Private Information due to the loss of security,

confidentiality, and privacy; (e) lost value of their Private Information; (f) emotional and mental distress and anguish resulting from the access, theft and posting of their Private Information; (g) disruption of their medical care and treatment; (h) lost time, effort, and expense responding to and preventing the threats and harm posed by the Data Breach; and (i) a continued substantial and imminent risk of the misuse of their Private Information.

363. Plaintiffs and the Class seek all monetary and non-monetary relief allowed by law, including any: economic damages; damages for emotional and mental anguish; nominal damages; enhanced or treble damages available under the law; court costs; reasonable and necessary attorneys' fees.

364. In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, among other things, strengthen their data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

365.

**COUNT III**
**BREACH OF THIRD PARTY BENEFICIARY CONTRACT**
**(On Behalf of Plaintiffs and the Class)**

366. Plaintiffs incorporate by reference and re-alleges each and every allegation set forth above in paragraphs 1 through 330 as though fully set forth herein.

367. Under HIPAA, a "business associate" is a person or entity, other than a member of the workforce of a covered entity, who performs functions or activities on behalf of, or provider of certain services to, a covered entity that involve access by the business associate to PHI. HIPAA rules require that a covered entity and any business associate enter into business associate agreements ("BAAs") requiring the business associate to appropriately safeguard PHI.

368. Pursuant to HIPAA, a "business associate must comply with the applicable standards, implementation specifications, and requirements of [HIPAA] with respect to electronic protected health information of a covered entity." 45 C.F.R. § 164.302. Those safeguards include obligations to implement administrative, technical, and physical safeguards. 42 U.S.C. § 17931 (applying security requirements to business associates and incorporating security requirements into BAAs between business associates and covered entities); see also 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards); 42 U.S.C. § 17902. These requirements are uniform and exist in every BAA.

369. Because Defendant's vendor involved in the Data Breach uses, analyzes, collects, obtains, and accesses personal health information of patients through the normal course of its business, including Plaintiffs' and Class Members' Private Information, upon information and belief, that vendor entered into a BAA with Defendant.

370. That BAA must contain identical requirements obligating signatories (*i.e.,* here, Defendant) to comply with HIPAA. The requirements in the BAA are intended to protect patients like Plaintiffs' and Class Members against the disclosure, theft, unauthorized access, or other harms stemming from the use of their medical information.

371. Thus, the contract was made expressly for the benefit of Plaintiffs and Class Members, as they were the intended third-party beneficiaries of the contract entered into between the vendor and Defendant. Defendant knew that if the vendor were to breach the BAA with the vendor, Plaintiffs and Class Members would be harmed.

372. Although the vendor was subject to a BAA and, therefore, HIPAA's requirements to implement adequate safeguards to protect PHI, the vendor failed to comply.

373. The vendor breached the BAA with Defendant by, among other things, (a) failing to use reasonably data security measures and protocols sufficient to protect Plaintiffs' and Class Members' Private Information from unauthorized access and exfiltration during the Data Breach, including by failing to adequately segregate Plaintiffs' and Class Members' Private Information and permitting access to the vendor's network containing Plaintiffs' and Class Members' unencrypted Private Information; (b) failing to use reasonably data security measures and protocols sufficient to detect the Data Breach, including failing to adequately monitor activity on the network containing Plaintiffs' and Class Members' Private Information; and (c) failing to promptly and adequately notify Plaintiffs and Class Members of the Data Breach.

374. As a direct and proximate result of Defendant's violation of HIPAA and breach of the BAA, Plaintiffs and Class Members suffered and will continue to suffer significant injuries, including, but not limited to (a) loss of privacy; (b) misuse and misappropriation of their identity, name and likeness; (c) fraud and identity theft from the misuse of their stolen Private Information; (d) diminution in the value of their Private Information due to the loss of security, confidentiality, and privacy; (e) lost value of their Private Information; (f) emotional and mental distress and anguish resulting from the access, theft and posting of their Private Information; (g) disruption of their medical care and treatment; (h) lost time, effort and expense responding to and preventing the threats and harm posed by the Data Breach; and (i) a continued substantial and imminent risk of the misuse of their Private Information.

375. Plaintiffs and the Class remain at heightened risk of future injury because their Private Information resides with the vendor and, further, because the vendor continues to gather new medical information on Plaintiffs and Class Members. Absent compliance to that contract's data security requirements, Plaintiffs and the Class remain at a heightened and substantial risk that

their Private Information will be subject to another data breach. Plaintiffs and Class Members are also entitled to their costs and attorney's fees incurred in this action.

376. As a direct and proximate result of Defendant's breach of third party beneficiary contract, Plaintiffs and Class Members have been injured and are entitled to damages. Plaintiffs and Class Members seek all available damages, including compensatory, consequential, general, and/or nominal damages, in an amount to be proven at trial.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class)**

377. Plaintiffs incorporate by reference and re-alleges each and every allegation set forth above in paragraphs 1 through 330 as though fully set forth herein.

378. This count is plead in the alternatives to the count for breach of third party beneficiary contract.

379. Plaintiffs and Class Members conferred a benefit upon Defendant by providing Defendant with their Private Information.

380. Defendant appreciated or had knowledge of the benefits conferred upon itself by Plaintiffs. Defendant also benefited from the receipt of Plaintiffs' and Class Members' Private Information.

381. Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiffs' and the Class Members' Private Information because Defendant failed to adequately protect their Private Information. Plaintiffs and the proposed Class would not have provided their Private Information to Defendant had they known Defendant would not adequately protect their Private Information.

382. Defendant should be compelled to disgorge into a common fund for the benefit of

Plaintiffs and Class Members all unlawful or inequitable proceeds received by it because of its misconduct and the Data Breach it caused.

**COUNT V**
**DECLARATORY AND INJUNCTIVE RELIEF**
**(On Behalf of Plaintiffs and the Class)**

383. Plaintiffs incorporate by reference and re-alleges each and every allegation set forth above in paragraphs 1 through 330 as though fully set forth herein.

384. This count is brought under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, which authorizes this Court to enter a judgment declaring the rights and legal relations of the parties and grant necessary further relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal statute and state common law as described in this Complaint.

385. Defendant owes duties of care to Plaintiffs and Class Members, which required them to adequately secure Plaintiffs' and Class Members' Private Information.

386. Defendant still possess Private Information regarding Plaintiffs and Class Members.

387. Plaintiffs allege that Defendant's data security measures remain inadequate.

388. Furthermore, Plaintiffs continue to suffer injury as a result of the compromise of their Private Information and the risk remains that further compromises of their Private Information will occur in the future.

389. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendant owed, and continue to owe, a legal duty to secure Private Information obtained from Plaintiffs and Class Members and to timely notify such individuals of a

data breach under the common law, and Section 5 of the FTC Act;

b. Defendant breached and continue to breach this legal duty by failing to employ reasonable measures to secure consumers' Private Information; and

c. Defendant's breach of its legal duties continues to cause harm to Plaintiffs and Class Members.

390. This Court should also issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols (and oversight of such protocols) consistent with law and industry standards to protect individuals' (i.e., those of Plaintiffs and Class Members) Private Information, including the following:

a. Order Defendant to provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

b. Order that, to comply with Defendant's explicit or implicit contractual obligations and duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to:

   i. engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's and vendors' systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

   ii. engaging third-party security auditors and internal personnel to run automated security monitoring;

   iii. auditing, testing, and training their security personnel regarding any new or modified procedures;

iv. segmenting their user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendant's and vendors' systems;

v. conducting regular database scanning and security checks;

vi. routinely and continually conducting internal training and education to inform internal security personnel (including of vendors) how to identify and contain a breach when it occurs and what to do in response to a breach; and

vii. meaningfully educating their vendors about the threats they face with regard to the security of their Private Information, as well as the steps they should take to protect themselves.

391. If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Defendant or its vendor. The risk of another such breach is real, immediate, and substantial. In fact, now that the vendor's insufficient data security is known to hackers, the Private Information in the vendor's possession is even more vulnerable to cyberattack. If another breach occurs, Plaintiffs will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

392. The hardship to Plaintiffs and Class Members if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiffs will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a preexisting legal obligation to employ such measures.

393. Issuance of the requested injunction will not disserve the public interest. To the

contrary, such an injunction would benefit the public by preventing another data breach involving Private Information provided to Defendant, thus eliminating the additional injuries that would result to Plaintiff, Class Members, and consumers whose confidential information would be further compromised.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a) For an order determining that this action is properly brought as a class action and certifying Plaintiffs as representatives of the Class and their counsel as Class Counsel;

(b) For an order declaring that Defendant's conduct violates the laws referenced herein;

(c) For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

(d) For the declaratory relief sought herein;

(e) For permanent injunctive relief to prohibit and prevent Defendant from continuing to engage in the unlawful acts, omissions, and practices alleged herein;

(f) For compensatory, consequential, and general damages, including nominal damages as appropriate, for each count as allowed by law in an amount to be determined at trial;

(g) For disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendant as a result of their unlawful acts, omissions, and practices;

(h) For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

(i) For pre-judgment and post-judgment interest on all amounts awarded; and

(j) Such other and further relief as the Court deems necessary and appropriate.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury of all claims in this Class Action Complaint so triable.

Dated: August 19, 2026

Respectfully submitted,

*/s/ Scott C. Harris*
Scott C. Harris (N.C. Bar No.: 35328)
**BRYSON HARRIS SUCIU & DEMAY PLLC**
**900 W. Morgan Street**
Raleigh, NC 27603
Tel: (919) 600-5000
Fax: (919) 600-5035
sharris@brysonpllc.com
Local Civil Rule 83.1(d) Attorney for Plaintiffs

W. Michael Dowling (N.C. Bar No. 42790)
**DOWLING PLLC**
P.O. Box 27843
Raleigh, NC 27611
Tel: (919) 529-3351
Fax: (919) 651-4631
Mike@dowlingfirm.com
Local Civil Rule 83.1(d) Attorney for Plaintiffs

Elliot Abrams (N.C. Bar No. 42639)
**CHESHIRE PARKER SCHNEIDER PLLC**,
P. O. Box 1029
Raleigh, NC 27602
Tel: (919) 833-3114
Fax: (919) 832-0739
elliot.abrams@cheshirepark.com
Local Civil Rule 83.1(d) Attorney for Plaintiffs

***Interim Liaison Counsel***

*/s/ Jeff Ostrow*
Jeff Ostrow
(admitted by special appearance)
**KOPELOWITZ OSTROW P.A.**
One W Las Olas Blvd, Suite 500
Fort Lauderdale, FL 33301
Tel: (954) 332-4200
ostrow@kolawyers.com

Mariya Weekes
(admitted by special appearance)
**MILBERG, PLLC**
333 SE 2nd Avenue, Suite 2000
Miami, FL 33131
Tel: (866) 252-0878
mweekes@milberg.com

***Interim Co-Lead Class Counsel***

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing **CONSOLIDATED CLASS ACTION COMPLAINT** was filed using the CM/ECF document filing service which will electronically send notice of the filing to counsel on record.

Dated: August 19, 2026

*/s/ Scott Harris*
Scott C. Harris (N.C. Bar No.: 35328)
**BRYSON HARRIS, SUCIU & DEMAY PLLC**
900 W. Morgan Street
Raleigh, NC 27603
Telephone: (919) 600-5000
sharris@brysonpllc.com

***Interim Liaison Counsel***